On June 12, 2014, Raymond McMillon was a passenger in a tractor-trailer who approached the United States Border Patrol checkpoint on Highway 59, 40 miles east of Laredo, Texas. The driver of that vehicle was Mr. Williams. When Mr. McMillon and Mr. Williams approached the checkpoint, Agent Pena asked two questions. He asked, are you a United States citizen, to which both the passenger and the driver said yes. And he asked, where are you going, and the driver responded that they were heading to San Antonio, Texas. There were no further questions asked by Agent Pena, and at that moment, Agent Pena was satisfied that the immigration inspection had been concluded. Agent Pena testified that about 35 to 40 seconds into the stop, the canine handler, who was Agent Hernandez, advised him that there was an alert. So he asked McMillon to lower the back bed, and McMillon answered that he could not lower it because it wouldn't go down. Agent Pena then boarded the truck and searched it physically, and upon searching the back of the truck, he found some aliens hiding behind the bed. Ten. Yes, Judge? Ten aliens. Ten aliens hiding, three of them in the bed. We had a preliminary question here. What is the dog alerting to? We asked that question, and the canine handler said that he can alert to either humans or drugs. Well, there were two humans driving the truck, so what was he alerting? How did he know they were illegal humans? I asked that agent specifically that question, how does the dog differentiate between the smell of an illegal alien and the passenger and the driver, and the agent could not respond. He says that they were trained to do that, which brings up an interesting question about the canine records that were asked for but were not provided. McMillon, on the other hand, testified that when agent Pena had finished his immigration inspection, nearly ten seconds into the stop, agent Pena asked him to go to the back to lower the top bunk. There was a video that was introduced into evidence, Record on Appeal 101, which shows the truck approaching, and it's very difficult to see because the video is grainy, but you can definitely tell that there is some movement in the front of the vehicle at 4.14 with 44 seconds. But you acknowledge that's about all you can tell is that there's some movement. Yes, there's movement. I mean, you can't discern anything else from it, though. I mean, I looked at it several times, and though you see movement, so what can we – I mean, having looked at it and seen it, I mean, what, if anything, can we glean from it? What I'd like to point out to the court – and there's three separate instances on the record. The video is not very long. It's about a minute and a half, and there's three separate times on the video where you could see a white shadow get up or sit down. And that's important because Mr. McMillan was wearing a white shirt with white shorts, and you could see that on Record on Appeal 239, while Mr. Williams, who was wearing a black shirt and black shorts, is on Record on Appeal 219. It's also interesting that in the video you can never see Agent Pena, who is standing up on the steps of the 18-wheeler, talking to Mr. Williams, move, and you can never see a shadow move from Mr. Williams' driver's side door. But you can see them when you're talking about the passenger, and specifically, Your Honor, at 414 with 44 seconds, you can see a white shadow get up. At 414 with 48 seconds, you can see the shadow go through the middle portion of the truck and head back. Both Agent Pena and Agent Hernandez acknowledged this at Record 380, 430, and 563. And then when Agent Pena testified that he went back to do the inspection himself of the truck, you can see a white shadow coming back and sitting down on the passenger's front seat at 415 with 43 seconds, and it's clear that you can see this. Well, I just want to tell you, and I'll look at it again, but I looked at it several times, and it's not narrating as clear as you say it is. I mean, I'm not- Yes. I get your argument. I'm just saying I haven't looked at it and looked at it and looked at it and looked at it. You see imagery. You can see some movement, but I'm just trying to follow how you reason from what, to me, looks inconclusive, the movement that you say. So you're telling me the testimony of the actors is what makes clear what otherwise isn't clear from just viewing the tape? Yes, and there's one more point, Your Honor. When Agent Pena discovers the aliens and he gets down from the truck, he gets down from the driver's side. He's wearing dark green. That's Border Patrol colors. The driver's wearing black.  But when Mr. McMillan is asked to step out, you can see it at 4.16 with 24 seconds that a white shadow stands up. And then at one second later, you can see the door open, and you see that same white shadow step out. And then at 4.16 with 27 seconds, you can see that Mr. McMillan is wearing a white shirt with white shorts. So those three different time events support Mr. McMillan's version of events that Agent Pena had began the inspection before receiving any type of consent or alert from the canine handler in this case. This is important because it was one of the cases that I cited, which was Portillo Aguirre, which was a bus case at the checkpoint where the agent had concluded asking all the immigration questions. And as he was walking back from the bus, he decided to ask a person whether he could search his luggage. And in that case, this court held that the immigration inspection had already concluded and that they could not extend even three minutes. And what's important is that recently the United States Supreme Court in Rodriguez addressed the issue of a prolonged detention on a traffic stop. And in that case, the officer had given the citation to the driver, he had already finished his purpose of the stop, and he asked the driver for consent to search. And the court said – the driver said no. He waited seven minutes for another officer to come. When they conducted a search, they found some drugs in the car. The Supreme Court in April of 2015 held that seven minutes did not matter, that there was no de minimis exception that had been cited by the Eighth Court of Appeals, and that said that the officer cannot earn bonus time. So what that means is that the officer can't even earn one second past the purpose of their immigration inspection. Let's step back a moment. How does your client have standing to challenge the search? Okay, well, he has standing to challenge the stop, and then the search would come into play. He testified that he came down from San Antonio, first from Houston to San Antonio, and from San Antonio to Laredo, Texas, with Mr. Williams with the purpose of helping him drive a vehicle to pick up a load. Well, that – unfortunately for you, that also supports a conspiracy allegation, but just as to standing – I've never heard that a mere passenger in a vehicle owned or driven by another had standing to challenge a search of the vehicle, apart from his own personal stuff. Your Honor, in United States v. Ky Lee, which is a Fifth Circuit case from 1990, both the driver and the passenger of a commercial tractor had testified that they were hired to drive a vehicle, they were given keys to a truck, and they were entrusted with the vehicle. In that case, this court held that both the driver and the passenger had standing to contest both the stop and the search. But in this case, you don't have any indicators of that. I mean there's nothing that I saw suggesting there was some prior arrangement about driving. He had not driven up to that point. There's nothing other than sort of the backwards argument saying, well, you know, he was going to drive. I mean do you agree the facts here are different than the case you just cited? I would agree that, for example, there was no contract of a truck rental agreement coming in, but I would disagree because Mr. McMillan testified that he came from San Antonio, Texas to Laredo specifically to help him drive because they were both tired. And so at the moment that he jumps onto the truck in San Antonio, Texas, he's developed an expectation of privacy and a possessory interest because he's agreed to come and help him drive. This is not like a case where a passenger just asks, can you give me a ride to my hometown and has no expectation of doing anything in particular. This case is distinguishable and fits the profile of the United States versus Kylie again because the truck was entrusted to both of them, and they drove to Laredo. They had a flatbed pickup truck. He testified that they were going to pick up some equipment. And so that was the only testimony that we had with regards to that. Well, if that's his testimony and that's a credibility issue and if we construe the record in favor of the result below, how does that help you? Well, if the factual sufficiency standard – that's why I'm arguing about this white shadow because if you find that Mr. McMillan, who was wearing white, is the person who was getting up prior to the alleged alert that took place at 4.15 with seven seconds, as testified by Agent Hernandez, then you can't get to the issue of standing on the search of the vehicle because it's already been a prolonged detention. And at that point, any evidence found would be excludable under the fruits of the poisonous tree. Where has this prolonged detention theory been – and this is – I'm probably just forgetting, but where has it been applied to border checkpoint searches? I mean, I know there was the bus case with the fellow on the bus, but they've got to look for marijuana concealed among melons in a big truck. And I just don't see how you – when you're looking for aliens and concealed contraband, I don't see how you can apply the same rigorous prolongation theory. The case of United States v. Ellis, which is another Fifth Circuit case from 2013, was also a case where they talked about border patrol checkpoints of a bus. And they said that once the officer had asked all the people in the immigration questions, they could no longer detain the passengers and ask them questions unrelated to that. That case, again, addressed this trivial delay that was being addressed by Bond One. And they said that it does not survive – a trivial delay is not good enough that once the immigration inspection is complete, you must let them go. An 18-wheeler is just like a vehicle. When I get to the checkpoint, the officer asks me if I'm a United States citizen, asks me where I'm going, and that's it. I'm on my way. If he asks for consent to search and I give it to him within that same timeframe, then perhaps he can continue to detain me. So all you have to do as a driver in that car who's carrying – or truck that's carrying something illegal is just pretend not to speak English and answer slowly. Is that – No, that's not true, Judge Jones, because you have to answer whether – the question is, are you a U.S. citizen? And the answer is yes or no. If the officer is satisfied, he doesn't ask you any more questions about citizenship. Well, we had a case – well, actually, we had a case. It's now on search of the U.S. Supreme Court where the people who were fellow either driver or passenger of the vehicle refused to answer. And I think he's wrong. I think that you have to answer the question because Martinez-Fuertes says that this is a valid immigration checkpoint. I think you can ask the question of U.S. citizenship. And in this case, he did, and he answered it. The agent could have asked him for identification to verify whether he's a citizen, but he didn't do that. He just asked, where are you going? And he said San Antonio and then continued to stop – to detain them and went into the search. So I believe under the facts of this case and under the case law that I've cited to the court that there was a prolonged detention, and it's supported by the evidence. The video, although grainy, on those three separate references support Mr. McMillan's version of events, and the court committed a factual error. Also, the agents, both of them testified, and both of them admitted that they had seen the shadow that I referred to, and that was again at 380-430-563. I would like to just quickly reference the speedy trial issue. In this case, there was a motion to suppress file. Mr. McMillan argued that the court should dismiss the indictment because it had proceeded beyond the 70 days that were non-excludable. The court referenced an entry that was off the docket where the court said that it had asked for some canine records that we had requested on three separate occasions. Early on into the case, we asked for those canine records. The judge denied it one day after I filed the motion. I asked for it again. The judge denied my motion again, and we proceeded with the motion to suppress the judge because she found that the issue on the shadow was problematic. She decided to have a second hearing. I see my light is on. Finish the sentence. The entry of the request for canine records was off the record, and there's nothing on the record to show that, in fact, she had requested or that the canine records had been turned in. Without an entry into the record, the court cannot use the exclusion up until December 22nd, as the court found, and Mr. McMillan argues that there was 100 total non-excludable days. All right. Thank you, Mr. Fair. All right. You've reserved your rebuttal time. Mr. Eaton. Your Honor, good morning. Good morning. May I please the court? Yes, sir. Your Honor, my name is Mike Eaton. I represent the United States on this appeal. I was also the prosecuting government counsel at trial below. We love to have trial counsel in front of us. They told me that especially you, sir, would appreciate that. Absolutely. First of all, Your Honors, with respect to the issue of the suppression motion, the appellant erroneously, the government's position, concludes that because Agent Pena was satisfied that Williams and McMillan were U.S. citizens, that that necessarily, like magic words, abracadabra, must have concluded the immigration inspection and that anything after that unconstitutionally prolonged the detention. But at trial and during the suppression hearings, the testimony indicated, and the court found that those questions were asked over a period of about 30 to 40 seconds. That period did not exceed the reasonable length of time that it takes to conduct an immigration inspection. And therefore that continuing seizure until such time as the dog alerted and Agent Pena was notified by Agent Hernandez of that was perfectly reasonable, even though he asked where you were headed after he had already been satisfied that they were, in fact, U.S. citizens. The purpose of these points is not just to see and talk to the people that are obvious to you. The other purpose is to look within a Fourth Amendment permissible way to see if there are any indicators that there are concealed persons. That's one of the reasons that they used the dogs, as I believe it was Judge Jones asked. The records that were provided to the court as a result of the appellant's request for discovery went into that. That particular dog and the dog handler had worked together. It was the handler, Agent Hernandez, was the only one that had ever worked with ARAHSA, and they had never lost their certification. Now, it is true that Agent Hernandez did have difficulty articulating the training methods when he was asked about them, and ultimately it came down to— Well, the point is this. If the dog is trained to detect humans and there were two humans already in the truck, what does this—what's the significance of the alert? Your Honor, the significance of the alert is dependent on where—it's one of the reasons that they walk around. If they're found, they're not holding it next to the ones that they know about. They're walking in areas where there shouldn't be anybody. And then if the dog alerts, which is what happened here, then that's an indicator that there may be concealed humans or narcotics. I know it was approved by the court, but just spatially, how far away is the driver from the cab where the bed is? Your Honor, I'm guessing that on most of those, it's roughly 10 or 12 feet. That far? Really? Okay. Well, I mean, you also have to keep in mind, Your Honor, it's up as well. Right. So you're at a diagonal. And the dog's on the ground. Correct, and kind of to the rear. Where the dog was standing, there should not have been anyone. So when the dog alerted and the court found that at that time was about the time that Agent Pena, standing up interviewing the two people, the driver and the passenger, was asking, where were you heading? And it happened almost simultaneously. The very next question then was, may I search the vehicle? And at that point, Mr. Williams provided his verbal consent for Agent Pena to look inside the vehicle. Now, with regard to the tape, if some of you have not had a chance to look at it, I would strongly urge you to do that because the tape has a number of problems with it. It's not very good quality. In fact, it probably creates more problems than it solves for the courts. It's wavy. It's grainy. When the truck drives up, there's no white shadow at all, as though Mr. McMillan is not even sitting there. It's not for some time that this white shadow, whatever it may be, including potentially the flashlight that appellant complained about in his brief, it's just not clear what it is. It pops up from time to time. It moves around. But you certainly can't tell what happened. The bottom line is that the trial court, after viewing everything, hearing the testimony, concluded that Agent Pena had received the notification from Agent Hernandez that the dog alerted and that he asked for consent from Mr. Williams before he entered the cab of the truck to look around, at which point he saw the aliens behind and under the sleeper area. Is that correct? Well, let me ask you one, just to make sure I understand it. On that, counsel opposites, well, you heard my question to him. I'm looking at the video. It's not clear. Are you saying it's the testimony of the agents that illuminates or makes clearer what one sees? So he stated to me what the agents said about the white image, et cetera, et cetera, to sort of clarify. So what's your take on his response to me about what the agent's testimony about the sequence does for our viewing of the tape? Do you follow me? Your Honor, I did, having read the record, I did not conclude that that was what the agents were trying to say. What appears from the record to be happening is two agents are being asked about an event that happened approximately nine months prior. And at that time, both sides and the court are showing them this video and trying to point out this event and that event and trying to get the agents to agree that something happened at a particular point. I believe that that's why the trial court essentially determined that they could not – that she could not tie it to a specific event on the video. And instead she determined that Agents Pinon and Hernandez were credible and that when they said that she had – when they said that they had permission from Mr. Williams before they began to search the cab of the truck, that ultimately was the trial court's finding. Now, appellate counsel also talked about United States v. Martinez talking about the search. The government's position is that Mr. McMillan, as the trial court found, does not have standing to challenge the search. The government concedes that were the seizure to be invalid, then the evidence obtained ultimately would not be applicable to appellant either. But the seizure was not invalid, so the question of the search comes down to whether or not Mr. McMillan has standing. And what that comes down to, Your Honors, as you know, is whether or not Mr. McMillan, as a passenger in the vehicle, had a possessory or a property right in the truck. The record is clear, and the trial court found that he did not. What appellate counsel referred to as his specific testimony that he was going to Laredo with Williams to help him drive, that was not exactly the testimony at trial. The testimony at trial was ambiguous at best. He said, I was going along to, you know, a ride and maybe help him drive. He also went on to say that he was – he didn't expect to be paid for what he was doing, at least not for that. So there is no possessory or property interest in the vehicle. In fact, Mr. McMillan didn't even have any of his personal belongings in the vehicle. Now, with regard to the United States v. Kai Sui, in that case the vehicle had been entrusted to a particular person. Here it had not been entrusted to Mr. McMillan at all. There's not even any indicators that the persons who lent it to Mr. Williams even knew Mr. McMillan was involved in this. Your Honor, there's one other point with regard to that. That refers to seizures, not the search itself. Again, we assert that McMillan does not have standing and that his appeal should be denied on those grounds. Now, with respect to the speedy trial issue, Your Honor, Your Honors, the trial court's grant of the continuances requested by the appellant were the basis for the delays in the trial. Each one of those had been requested by the defense counsel and were granted by the trial judge after reviewing the assertions that they made therein. In fact, on the day of the hearing on January 12th, the trial judge discussed with Mr. Williams' counsel and with Mr. McMillan's counsel whether or not she should have relied on their assertions. They agreed that she should. Now, the issue, again, appears to be a sort of a magic words kind of thing and when that occurs. According to appellant, the trial court should have made those findings at the time. And that would be the best practice. The government concedes that. That's the case law. However, it is not required. Appellant cites the United States of Eugenic, which is a Seventh Circuit case, for the proposition that the trial court essentially can't make those findings later. But that's not what that case stood for. What the case stood for was that you can't grant the continuances retroactively. The phrase that had been used by Judge Posner in that opinion was that a judge could not grant an ends of justice continuance non-pro-tune. I'm sorry. Non-pro-tunc. Providing after – they don't teach Latin in law schools. Providing after – and what his concern was was providing after-the-fact justification for unauthorized delays. Here there was no after-the-fact justification because the defense counsel provided the justification to the trial court ahead of time. Moreover, in making their calculations, they excluded quite a bit of time that should have been involved there. As far as these off-the-record events that occurred, there may not have been docket entries, but almost all of them had something where there was a filing or some other matter where those, quote-unquote, off-the-record events were documented in the trial record. For example, when the court ordered the government to provide the materials related to the canine and canine training on October the 15th, the court issued an order, a written order, telling the government to provide the materials by October the 22nd. The government did that. Now, granted the court didn't turn around and say – make a docket entry saying that they had received them, but the appellant was on notice that that had occurred. A number of the other occurrences where after asking for those delays and being granted them, then the appellant is just arguing that they shouldn't count toward the speedy – they shouldn't hold the speedy trial clock. Well, that's the very essence of the act. The district judge's findings with regard to the ends of justice under United States v. Dignam, Zedner, and also Bloke do not have to occur simultaneously. That's a best practice, but one of the reasons that we require parties to object and bring it to the lower court's attention is to allow them to remedy it while it's still able to be remedied without it becoming an appellate issue. What's the government's role in maintaining the Speedy Trial Act requirements? In other words, if you see the time slipping away, doesn't the government have a tickler system or something? Yes, we do, Your Honor, or at least I do. Since I was in the military calculating these things, I've calculated them and basically kept a calendar. This was the first time that I had used the federal system, and it was a little bit difficult for me to figure out at first as well. But yes, we do. But we believed, and when we met with the two defense counsel at the time, we told them that we didn't think that the Speedy Trial Clock had gone over even 40 days at that point in time. I did tell them I don't know the exact number of days, but it's under 40. When they filed their motion, we went back and we calculated it with some more precision, and we came up with 30 days. Part of the reason for that was because the case had handed off to another counsel – well, actually two. One of them I was able to get with, and I felt that we had a reasonable basis for believing that those findings had occurred. The other one I had no idea really, so we included it. When Judge – the lower court came back and made the findings on the record, the calendars were practically the same. But the bottom line is that there is nothing in Fifth Circuit precedent that prohibits the judge from making a finding after the fact, and it just makes sense. Sometimes things get forgotten, especially with something like a request for a continuance, because they're not usually handled with a hearing, and people forget. Judges are human too, or at least it's rumored. You want to say that again? I'm sorry, sir? You want to say that again? Yes, Your Honor. You don't want to say that we're human too? Okay. Did the trial court and some judges independently kind of keep up with it, or had a courtroom deputy or whatever? It's sort of tied to the question Judge Jones asked. Many judges do depend on the government to be keeping tight rein on this deal to keep anybody from getting in a ditch. My question is whether in this instance where she later calculates it, did she independently calculate it herself and say this is, or did she accept the calculations that the government presented or not in coming to the conclusion? No, Your Honor. I believe that she calculated it herself because, as I mentioned, there were some differences in the times where I was not aware of something that had occurred, and she was. So when she went back, she included those things. Okay. She also took into account some things that were not obvious to someone who had not been at them at the time. For example, in the motion to suppress, the defense counsel orally re-urged his request for discovery. That would have had an effect on the speedy trial clock had it not already been stopped. She was aware of that and included it, mentioned it when she was calculating her timeline. The other thing is that the really big factor is the 30 days for taking it under advisement. Apparently when she had the first motions hearing on September 22nd, she said she was taking it under advisement, and that's where appellant is counting from there, not taking into account a whole host of things that happened all the way up until December 17th when the government turned over those last records that the court had asked for. All right. All right. Thank you, Ms. Deaton. I believe we have the government's argument. Back to you, Mr. Bailey. You have rebuttal time if you need it. Your Honors, I'd like to address first and foremost the issue about the K-9 records and causing this delay. Mr. McMillan asked for his first request on K-9 August 18th because we knew that we were having a suppression hearing regarding an alert, an alleged alert by the K-9 handler. The judge denied that motion one day after we filed that motion. We had to file a second motion, September 17th, requesting the same K-9 records, arguing to the Supreme Court case law that required the government to turn over those records so that we can address the reliability and the proficiency of the K-9. Judge denied my motion the next day as well. So Mr. McMillan was diligent in requesting these records, and it was not until Judge Marmolejo had the hearing that she found Agent Hernandez's testimony a little problematic with regards to the amount of walkthroughs that the K-9 handler had made. Specifically, the K-9 handler, as soon as the truck got there, did his first approach and ran a downwind sniff, he testified, and it was at 414 with 25 seconds. You can see that on the video. And then he did a second search at 415 with zero seconds, but instead of going back to the driver like he alleged to tell Agent Pena that he had an alert, he goes to the canopy, and you can see that clearly on the video. And the canopy is about three feet from where the 18-wheeler is, and that's why Agent Pena had gotten up to the steps of the tractor-trailer, because he claimed he couldn't hear because of the engine noise and the muffler noise of the tractor-trailer. And then he does a third walkthrough at 416 with zero one seconds. This is the third time he's walked his dog to try to get what he claims is an alert. After he testified to all those things, and despite that, during the first hearing, Judge Marmolejo said, on the record, I take this matter under advisement. Mr. McMillan, you have 30 days to either enter a plea of guilty or go forward with your trial. She was making that reference, Record and Appeal 531, because she was contemplating that the matter was taken under advisement. She's giving my client those 30 days that she has to decide the motion. But yet, even saying that she had taken the matter under advisement, she recalled the hearing for the second hearing, and she states that the purpose was, at 541, she wanted us to check because she believed the search had started before consent or probable cause had been developed. She said the testimony was contradicted by the video. She tells, based on what I see on the video, this is at 564, it seems that Mr. McMillan stood up and went to the back prior to anything else happening. And so even the judge acknowledges this white figure. And going back to the search, Judge Stewart, if you – there was about eight different Border Patrol agents who got onto the truck at different times from both the passenger side and the driver side. Not one of those persons can you see a shadow walk going through the front of the windshield because they're wearing dark green. All of the aliens were wearing dark colors, black or purple, and you can see that in the exhibits that are listed. None of the aliens, as they came down, can you see any movement coming through the front windshield. The only movement that you see on multiple occasions is this white figure, and the only person wearing white that night was Mr. McMillan. And so we think that the video is conclusive that shows that Mr. McMillan was the person who was ordered to take down the bunk before probable cause had developed, and it caused a prolonged tension. Thank you. All right. Thank you, Mr. Vail. You're court-appointed, and the court appreciates your service and all those who accept the appointments from our court to represent in these cases. The briefing and the oral argument is appreciated. Thank you. All right. Thank you, Mr. Eden, for your briefing.  All right. We'll call off the –